**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

IN RE

PETE E. DAILEY  CASE NO. 21-50752
MELISSA N. DAILEY

DEBTORS  CHAPTER 7

**MEMORANDUM OPINION AND ORDER**
**DENYING MOTION TO DISMISS CASE**

Debtors Pete E. Dailey and Melissa N. Dailey filed a chapter 7 bankruptcy petition and schedules that include debts owed to two unsecured creditors for personal liability on business debts totaling approximately $142,000. Wood Finance Inc., d/b/a Premier Acceptance ("Creditor"), one of those scheduled unsecured creditors, moved to dismiss Debtors' bankruptcy case under § 707(a),[1] alleging that Debtors filed their case in bad faith [ECF No. 19 (the "Motion")]. In essence, Creditor argues that Debtors underreported income and certain expenses on their Schedule I/J, and over-reported other expenses, evidencing a "pattern of abuse" and that "Debtors continue to live a lifestyle they desire with no respect for making lifestyle accommodations before filing bankruptcy." [Motion at 1, 5 ¶ 11.]

The parties filed legal briefs and supporting evidence in connection with Creditor's Motion [ECF Nos. 19, 27, 31, 32] and requested the Court take the matter under submission based on the record. The following constitutes the Court's findings of fact and conclusions of law pursuant to Rule 7052.

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532. References to the Federal Rules of Bankruptcy Procedure appear as "Rule ___."

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter. 28 U.S.C. § 1334(b). Venue is proper in this District. 28 U.S.C. §§ 1408 and 1409. This is a core proceeding, and the Court is authorized to enter a final order adjudicating this matter. 28 U.S.C. § 157(b)(2)(A).

## FACTS

Debtor Pete Dailey is a 52-year-old high school graduate with a 27-year career in car sales. He operated his own business between 2015 and 2018. It failed, resulting in Debtors' unsecured non-consumer business debts of about $142,000. Mr. Dailey now works for Paul Miller Ford in Lexington, Kentucky, as a commissioned salesperson. Debtor Melissa Dailey is a homemaker and earns no income. Debtors have two sons, aged 15 and 13. Debtors also have custody of a 1-year-old grandchild of Mrs. Dailey's daughter from a prior marriage. Thus, five people live in Debtors' household.

In 2019, Creditor obtained a default judgment against Debtors in the State of Indiana. Creditor later domesticated the judgment in Kentucky for enforcement purposes and initiated a wage garnishment against Mr. Dailey on June 2, 2021. The wage garnishment caused Debtors to file their chapter 7 petition.

Debtors filed the standard schedules and related documents with their petition. Based on the calculations made in their Official Form 122A-1, Debtors reported that no presumption of abuse in filing a chapter 7 exists based on the "Means Test" under § 707(b). Debtors' Schedule E/F lists two non-contingent/undisputed debts owed to Creditor in the amounts of $67,952.00 (a judgment on account for personal liability on a business debt) and $3,822 (for a deficiency on a repossessed automobile). Debtors also scheduled a $74,189 business debt owed to another unsecured creditor and other

2

unsecured debts for amounts significantly lower than what Debtors owe to their two largest unsecured creditors. Debtors' Schedule I/J, their estimated monthly budget, includes gross monthly income for Mr. Dailey of $9,500.

The present dispute mainly concerns the parties' cross-interpretations of Debtors' budget. Creditor obtained leave of Court to conduct a Rule 2004 Examination of both Debtors. After taking Debtors' testimony and reviewing documents they provided, Creditor filed the Motion and depicts Debtors' Schedule I/J as so inaccurate and inconsistent as to evidence bad faith. Debtors dispute Creditor's contentions regarding this schedule. The contested budget items are:

> 1. Creditor's contention: Mr. Dailey's pay stubs show his 2021 income earned through August 21, 2021 (i.e., including post-petition income) to be $85,369.78, or $11,120.20/month, yet Debtors scheduled his monthly gross income at $9,500.
>
> Debtors' testimony:   In completing the petition and schedules, Debtors considered their income between December 2020 and May 2021 and used an average of $9,500 for Mr. Dailey's gross income. In fact, the six-month prepetition average was $8,870.87. Debtors also state: "Mr. Dailey's commission income spiked during the months of January through August 2021, driving his monthly averages higher. However, his net commissions for September 2021 were back to the average net he was experiencing as of December 2020, i.e., $4,713.06[.]" [ECF No. 32 at p.9.]
>
> 2. Creditor's contention: Debtors obtained a $297,000 mortgage on a $305,000 residence in January 2021 and filed bankruptcy in June 2021. Their monthly mortgage payment is $1,824.37 but Debtors scheduled the payment at $2,000. At his Rule 2004 Examination, Mr. Dailey stated that he pays the mortgage late each month, resulting in fees and penalties.
>
> Debtors' testimony: Debtors scheduled the mortgage payment at $2,000/month "likely due to a recent late fee they had paid. Due to the timing of [Mr. Dailey's] pay date versus the due date of the mortgage payment, the Debtors are often trapped into paying late fees. They literally live month to month." [*Id*. ¶ 9.] Before buying their home, Debtors "paid rent of $1750.00, so purchasing a home was not lavish, but prudent." [*Id*.]

3

3. Creditor's contention: Debtors' pay $530/month to care for their .44 acre property, while their petition scheduled the expense at $150/mo. This discrepancy "highlights Debtors' lavish lifestyle." [ECF No. 31 ¶ 6.]

Debtors' testimony: Debtors pay for lawn care because Mr. Dailey works long hours, does not have time to do the labor himself, and does not want his wife or children to do the work for safety reasons. "During peak season, weekly lawn care is required at $125.00 per week. There is no yard care needed in the winter season. [Debtors scheduled an average of] $150.00 per month, which is probably a little low given the amount [Debtors pay] during the growing season." [ECF No. 32 ¶ 10.]

4. Creditor's contention: Debtors' handwritten statements and receipts for monthly utility expenses reflect that they total about $942.70/month, but Schedule I/J reports that Debtors spend $1,025/month for utilities.

Debtors' testimony: Debtors' utility expenses fluctuate seasonally; their electricity expense is higher in the summer and natural gas is higher in the winter. "Debtors provided their household budget with the figures set forth on Schedule J and have provided proof of the expenses of same. The $82.30 discrepancy is based on a one-month snapshot of monthly expenses produced in connection with the 2004 Examination." [*Id.* ¶ 11.]

5. Creditor's contention: Debtors' bank statements reflect that they pay about $406/month for housekeeping and supplies and $1,725/month for food (on the low end), but Debtors' Schedule I/J reports only $1,000/month spent on food and housekeeping supplies.

Debtors' testimony: While Debtors' bank statements reflect that they spend more than $1,000/month on food, this expense is "still in line with the IRS National Standard of $2,081.00 per month for a family of their size. It was not intended to be underestimated; it was simply an unrealized fact until they reviewed their bank statements more closely." [*Id.* ¶ 12.]

6. Creditor's contention: Debtors' bank statements reflect that they pay at a minimum $641.76 monthly for entertainment, but their schedules report only $150/month on entertainment.

Debtors' testimony: Debtors' bank statements reflected entertainment expenses "such as Netflix, Hulu and You Tube and two trips to Malibu Jack's. The only out of the ordinary expense was one hotel stay which, if subtracted, brings the monthly total to $309.98, a portion of which is TV services. On Schedule J, the Dailey's only deducted $150.00 per month for this category as the TV services were a separate entry." [*Id.* ¶ 13.]

7. Creditor's contention: Debtors' childcare and education expense "correlate to a babysitter on the weekends[,]" specifically a babysitter on Sundays who is paid $100 in cash. [ECF No. 31 ¶ 8.c.; ECF No. 31-7.]

4

Debtors also included "exorbitant travel expenses associated with their children's' AAU basketball teams and tournaments[.]" [*Id.*]

Debtors' testimony: Debtors admit paying a babysitter $100/week for a full day of childcare. Debtors also state that their "son is an accomplished young basketball player and his talent and passions are encouraged by his parents. They are hopeful for future college scholarships. The Debtors' bank statement reflects a monthly recurring charge of $141.00 for the son's basketball" which "is not excessive or lavish." [ECF No. 32 ¶ 14.]

8. Creditor's contention: Debtors' bank statements reflect that they pay $517.91/month for a 2017 Ford Expedition, which is $82.09 less per month than listed on Schedule J. Mr. Dailey admitted at his 2004 Examination that he makes the car payment late and incurs fees as a result.

Debtors' testimony: Debtors have only one vehicle and "realize that they have had to pay this bill late on several occasions, which results in having to pay late fees. This is part of living month to month, dealing with the husband's payroll schedule versus due dates of the payments. This does not resemble Debtors who live a lavish or excessive [lifestyle]." [*Id.* ¶ 15.]

9. Creditor's contention: Mr. Dailey frequently withdraws funds from ATM's throughout Kentucky and "knowingly incurs a fee each time he uses" an ATM not affiliated with his bank. [ECF No. 31 ¶ 8.e.] Debtors' June 2021 bank statement reflects that Debtors withdrew funds from "non-conforming" ATMs at least seven times, incurring additional fees each time. In addition, "[b]ased off the [bank] statements provided, [Debtors] unnecessarily had $288.00 in overdraft fees in 2021 as of June 8, 2021." [*Id.*]

Debtors' testimony: Debtors know Mr. Dailey incurs fees when using ATMs and are "attempting to find a bank that will work with his ATM" but Mr. Dailey "has no credit cards and relies on cash. There are times cash is needed and there isn't time to attempt to locate or travel to an ATM that complies with his bank. This does not show proof of a lavish lifestyle." [ECF No. 32 ¶ 17.]

10. Creditor's contention: Debtors' bank statements reflect that they spend about $233.20 on gas, but Schedule J states that they spend $400/month.

Debtors' testimony: Debtors' transportation costs vary by need and include gas as well as vehicle maintenance: "The $400.00 per month listed on the budget, also takes into consideration, and maintenance such as tire rotations, replacement of tire, oil changes, and other repairs that are needed to keep the vehicle in running order. If anything major needs to be replaced or repaired on this type of vehicle, it will more than likely be in excess of a $166.80 average. Just replacing 4 tires will be in excess of $1200.00[.]" [*Id.* ¶ 16.]

5

Creditors' interpretation of the foregoing matters is that Debtors lacked good faith in filing for bankruptcy because they "continue to maintain a lavish lifestyle while inflating the amounts paid on certain debts such as Food and Housekeeping and downplaying certain funds they are spending on arguably luxury or convenience items, including but not limited to entertainment and lawn care." [ECF No. 31 ¶ 9.] Debtors have a different view; they satisfied the Means Test for seeking relief under chapter 7, lack "a disposable income sufficient to pay a meaningful percentage of [their] unsecured debt[,]" and "without a fresh start, [Debtors] will be under the iron fist of debt collection laws and will be unable to maintain economically." [ECF No. 32 at p.8.]

## CONCLUSIONS OF LAW

**A.    Legal Standard and Burden.**

Creditor contends that Debtors' bankruptcy case should be dismissed "for cause" pursuant to § 707(a), which states that a "court may dismiss a case under this chapter only after notice and a hearing and only for cause, including" three specific grounds that are inapplicable here. 11 U.S.C. § 707(a). The Sixth Circuit has explained that the word "'including' is not meant to be a limiting word," and a chapter 7 case may be dismissed for "cause" other than those listed in subsections (1) through (3) of § 707(a). *Indus. Ins. Servs. v. Zick (In re Zick)*, 931 F.2d 1124, 1126 (6th Cir. 1991) (citations omitted). To that end, a debtor's lack of good faith may constitute cause for dismissal under § 707(a). *Id*. at 1126-27 (collecting cases).

"The test for 'good faith' is fact-specific and turns on the evaluation of multiple factors, resulting in what has been termed a 'smell test.'" *Baxter v. Sarmadi*, 602 F. App'x. 322, 325 (6th Cir. 2015) (quoting *Zick* at 1127-28). A dismissal for lack of good

6

faith "should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish life-style, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." *Zick*, 931 F.2d at 1129.

As the movant, Creditor carries the burden to establish cause to dismiss by a preponderance of the evidence. *In re Gaulden*, 522 B.R. 580, 588 (Bankr. W.D. Mich. 2014) (citing *Simon v. Amir (In re Amir)*, 436 B.R. 1, 16 (B.A.P. 6th Cir. 2010)). Motions to dismiss a petition under § 707(a) are made to the court's discretion. *Zick*, 931 F.2d at 1126. As this Court has explained:

> *Zick* sets a very high bar for finding that debtors lack good faith. The Sixth Circuit reserved that determination for only "egregious cases" involving concealed or misrepresented assets, excessive expenses, lavish lifestyles, and intent to avoid a single debt. Although courts have developed a variety of factors for consideration after *Zick*, its exacting standard remains intact.

*In re Martin*, Ch. 7 Case No. 18-60270, 2018 Bankr. LEXIS 3656, at *31 (Bankr. E.D. Ky. Nov. 21, 2018).

**B. Creditor has failed to prove that Debtors lacked good faith in filing their petition.**

Although Creditor faces a "very high bar" to prove Debtors' lack of good faith in filing the petition to succeed on this Motion, Creditor's counsel expressly told the Court that there was no need for an evidentiary hearing. Creditor thus chose not to call Debtors as witnesses so that the Court could hear their testimony under cross-examination, observe their demeanor, and assess their credibility. In fact, even though Creditor conducted a Rule 2004 Examination of both Debtors, Creditor did not provide a transcript of their testimony to support the Motion, and instead merely characterizes that testimony.

7

As a result, to find an absence of good faith here, the Court can consider only Creditor's contentions based on its analysis of and perspective on Debtors' bills and bank statements, and Debtors' sworn, written explanations regarding Creditor's assertions and re-framing of the facts. One court depicted an analogous situation as

> a task of untold difficulty for a court to determine the credibility of a witness from a cold [record], when the appearance and demeanor of that witness obviously cannot be taken into account. … The demeanor of the witness before the trier of fact, with an opportunity to appraise credibility, may well mean the difference between acceptance and rejection of crucial testimony.

*I.H. Mississippi Valley Credit Union v. O'Connor*, 149 B.R. 802, 805 n.1 (Bankr. E.D. Va. 1993).

Upon review of the written record, the Court cannot find that Debtors lacked good faith in filing their petition using the criteria set forth in *Zick*. Creditor failed to meet its burden.

    **1.**    **Concealed or Misrepresented Assets and/or Sources of Income.**

The first *Zick* factor is the presence of "concealed or misrepresented assets and/or sources of income." *Zick*, 931 F.2d at 1129. Creditor does not contend that Debtors have concealed any assets. Creditor also does not argue that Debtors have concealed any source of income; rather, Creditor contends that Debtors underreported Mr. Dailey's monthly earnings at $9,500 on Schedule I (which instructs Debtors to "[e]stimate monthly income as of the date you file this form" [ECF No. 1 at 27 (emphasis removed)]) and at $9,512.95 on Official Form 122A-1 (which instructs Debtors to "[f]ill in the average monthly income that you received from all sources, derived during the 6 full months before you file this bankruptcy case" [*id*. at 41 (emphasis removed)]). To support

its position, Creditor filed Mr. Dailey's earnings statements for the period from the pay date of December 4, 2020, through the pay date of August 27, 2021. [ECF No. 31-2.]

Debtors filed their petition on June 23, 2021, and so several of the earnings statements provided are irrelevant for purposes of determining Debtors' "current monthly income" for use in the Means Test under § 707(b) and Official Form 122A-1. The period for purposes of that analysis runs from December 2020 through May 2021, the six full months before Debtors filed their petition. In that period, according to the earnings statements provided, the Court finds that the average of Mr. Dailey's monthly earnings was $8,870.87.

In contrast, "Schedule I requires debtors to report their projected average monthly income going forward from the commencement of the case[,]" not an average of prepetition income. *In re Goble*, 401 B.R. 261, 267 (Bankr. S.D. Ohio 2009). Debtors filed sworn testimony that they attempted to estimate their anticipated future income on their Schedule I, and plausibly explain the increase in Mr. Dailey's post-petition earnings as due to higher recent car sales commissions that are unlikely to continue, as evidenced by Mr. Dailey's most recent earnings statements. Creditor's contention that Debtors underreported their income lacks merit.

2. **Intention to Avoid a Single Debt.**

Dismissal for a lack of good faith may be appropriate if a debtor filed bankruptcy with the "intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." *Zick*, 931 F.2d at 1129. Creditor does not contend that such conduct occurred here.

Although Creditor contends that Debtors filed their bankruptcy petition only after Creditor domesticated its judgment and obtained wage garnishment on Mr. Dailey's income, Creditor does not contend that Debtors filed their case solely to avoid Creditor's debt—or that this debt resulted from "conduct akin to fraud, misconduct, or gross negligence." Debtors represent that the debt owed to Creditor stems from personal liability on a failed business venture, and Creditor apparently agrees. [ECF No. 31 ¶ 3 (stating that Creditor obtained a judgment "against Debtors and Dailey Auto Sales, LLC in 2019").] In addition, Debtors' Schedules D and E/F reflect that Debtors carry other significant secured and unsecured debt, and Schedule I/J reports that Debtors have a negative net monthly income (as further discussed below), which supports Debtors' sworn statement that they "literally live month to month." [ECF No. 32 ¶ 9.] The Court finds that Creditor has not established by a preponderance of the evidence that Debtors filed their petition to avoid a single debt based on conduct akin to fraud, misconduct, or gross negligence.

        **3.     Excessive and Continued Expenditures / Lavish Lifestyle.**

Finally, *Zick* counsels that debtors may lack good faith if they have "excessive and continued expenditures [reflecting a] lavish lifestyle[.]" *Zick* at 1129. The Court has reviewed and considered Creditor's contentions and Debtors' responses thereto regarding Debtors' expenses. But the Court found no discussion in the parties' submissions of authority that puts into context what constitutes a "lavish lifestyle" based on excessive and continued expenditures. Several courts have explained how to assess whether a lifestyle is lavish; one court discussed the issue as follows:

> When considering whether a debtor's lifestyle is "lavish", a court may consider whether items he has purchased have been "luxury goods". The

> Code does not define "luxury goods" other than in the negative; "'luxury goods and services' do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor." 11 U.S.C. § 523(a)(2)(C). In the absence of a more affirmative definition, opinions dealing with the term "luxury" have "considered whether under circumstances of each particular case the purchases or transactions were 'extravagant,' 'indulgent,' or 'nonessential.'" *In re Hernandez*, 208 B.R. 872, 880 (Bankr. W.D. Tex. 1997); *citing*, *Carroll & Sain v. Vernon (In re Vernon)*, 192 B.R. 165, 170 (Bankr. N.D. Ill. 1996). "An item, therefore, need not be purchased on Fifth Avenue to be considered a 'luxury'. Rather, factfinders are to examine the circumstances surrounding the purchase or transaction to determine whether the transactions should be classified as a 'luxury' in a given case." *Hernandez*, at 880 (citations omitted). *Hernandez* held that a debtor's purchase of new rugs, phones, and draperies a short time pre-petition were "luxury goods," for purposes of § 523(c). The court believed that the purchases satisfied no purpose other than beautifying the debtors' home and satisfying their material desires. *See also*, *In re Kamen*, 231 B.R. 275 (Bankr. N.D. Ohio 1999), (Chapter 7 petition of financially sophisticated debtor and unemployed spouse dismissed for bad faith where, shortly pre-petition, debtors substantially remodeled home, leased three cars, did not even attempt to modify their lifestyle, and incurred over $ 160,000 credit card debt to fund that lifestyle).

*United States v. Lacrosse (In re Lacrosse)*, 244 B.R. 583, 587-588 (Bankr. M.D. Pa. 1999). Another court explained how to assess "lavish expenditures" in this way:

> To be sure, some cases have approved dismissals of debtors' petitions for bad faith where, as here, evidence existed of lavish expenditures on luxuries such as private school education and expensive housing. As one court noted "bankruptcy protection was not intended to assist those who, despite their own misconduct, are attempting to preserve a comfortable standard of living at the expense of their creditors." *In re Kamen*, 231 B.R. at 278. Yet, it is significant to note that in each of these cases, there is also present some evidence of debtor misconduct, whether it be misrepresenting assets and expenses on schedules and statements filed with the petition, or committing fraudulent acts at the expense of his creditors, such as transferring significant assets beyond their reach. Indeed, virtually every case that has addressed the issue has heeded the Sixth Circuit's holding that dismissals for lack of good faith "should be confined carefully and … generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." *Zick*, 931 F.2d at 1128.

11

*McDow v. Smith*, 295 B.R. 69, 81 (E.D. Va. 2003) (footnotes omitted).  Still another court described viewing the "lavishness" of a debtor's lifestyle as a relative concept:

> The terms "lavish," "extravagant," "excessive" or "exorbitant" are relative terms; relative to the population as a whole; but not relative at all without reference to that population.  They are not triggered simply because a debtor can live a more austere lifestyle but should be considered only in relation to a debtor's lifestyle, when that lifestyle is compared with the lifestyles of other people, debtors and non-debtors alike.
>
> In other words, the standard should not be used to manage a debtor's paycheck each month, without reference to the size of that paycheck.  Just the use of the word "extravagant" presumes that a debtor makes, or at least has, a lot of money.  If not, the debtor could not live a lifestyle that can be considered lavish, extravagant, excessive or exorbitant.  The plain meaning of the word defines a circumstance in which a debtor, because of income far above the norm, is able to afford many more of the amenities of life than someone who earns wages that are closer to the norm.

*In re Attanasio*, 218 B.R. 180, 209 (Bankr. N.D. Ala. 1998).

With these standards in mind, the "cold record" before the Court lacks sufficient evidence to establish that Debtors live a "lavish lifestyle" based on "excessive and continued expenditures."  Stated differently, the Court has no basis on which to conclude that Debtors' explanations for the challenged expenses on their Schedule I/J, such as for food and housekeeping supplies, transportation, child care, and home maintenance, should not be accepted.  The Court disagrees with Creditor that bank ATM fees and overdraft fees, and fees incurred for untimely mortgage or car payments, reflect that Debtors have "excessive" expenditures that establish a "lavish lifestyle."

## CONCLUSION

Creditor held the burden on this Motion to meet a "very high bar."  It failed to meet that burden by showing that this is one of "those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and

12

continued expenditures, lavish life-style, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." *Zick*, 931 F.2d at 1129.

Therefore, the Motion is DENIED.

13

___

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
*Tracey N. Wise*
**Bankruptcy Judge**
Dated: Wednesday, December 15, 2021
(tnw)